# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
**No. 23-1024V**

|  |  |
|---|---|
| JEANNETTE ALVAREZ,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br><br>Filed: March 23, 2026 |

*Daniel Alholm, Alholm Law PC, Chicago, IL, for Petitioner.*

*Ryan Nelson, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On July 3, 2023, Jeannette Alvarez filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges a shoulder injury related to vaccine administration ("SIRVA") due to her receipt of an influenza ("flu") vaccine on November 5, 2021. Petition (ECF No. 1). The case was assigned to the Office of Special Masters' Special Processing Unit ("the SPU").

---

[1] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons set forth below, I find that Petitioner has preponderantly established that her prior left shoulder symptoms would not explain her post-vaccination complaints. In the absence of any other objections from Respondent, and based on an independent review of the evidence, I conclude that Petitioner has established entitlement to compensation for a Table SIRVA. Furthermore, I have determined that the submitted evidence justifies a past pain and suffering award of $125,000.00.

## I.    Procedural History

The claim was assigned to SPU in October 2023. Respondent formally opposed any Vaccine Program compensation award, specifically contending that Petitioner's prior history may explain her alleged SIRVA. Rule 4(c) Report filed May 9, 2024, ECF No. 16.[3] The parties briefed entitlement, and in the event that Petitioner indeed established a Table SIRVA, the potential damages award. Brief filed Dec. 24, 2024, ECF No. 26; Response filed Feb. 24, 2025, ECF No. 25; Reply filed Mar. 11, 2025, ECF No. 26. Petitioner duly filed outstanding orthopedics records as Ex. 11, and the parties confirmed that the case was ripe for adjudication. *See* Response at 4 n. 1; Scheduling Order filed Nov. 3, 2025, ECF No. 27; Ex. 11 filed Dec. 3, 2025, ECF No. 28; Joint Status Report filed Dec. 4, 2025, ECF No. 30.

## II.    Evidence[4]

### A. Medical Records

Petitioner was born in 1979. She received medical care through the Kaiser Permanente managed care consortium. *See generally* Exs. 4-7, 11; Ex. 2 at ¶ 2 (testifying that her primary care practice from prior to 2019 has gone out of business).

*Before Vaccination*

On October 15, 2020, Petitioner received a flu vaccine in her left deltoid. Ex. 4 at 198-200, 208. Nineteen (19) days later, on November 3, 2020, the primary care physician ("PCP") recorded Petitioner's complaint of "left shoulder pain primarily in pectoralis and

---

[3] Respondent also disputed whether Petitioner could establish the alleged vaccination, based on a lack of contemporaneous documentation. Rule 4(c) Report at 6-8. I offered preliminary review and analysis that this requirement could likely be met, and that "if Respondent wishe[d] to continue to contest this issue, he should specifically identify outstanding evidence that might aid in its resolution." Scheduling Order entered July 17, 2024, ECF No. 17 at 1-2. Bot Respondent has not identified any such evidence, and he now concedes the fact of vaccination. Response at 3 (stating that on November 5, 2021, "Petitioner received a flu vaccine").

[4] While I have not specifically addressed every medical record, or all arguments presented in the parties' briefs, I have fully considered all records as well as arguments presented by both parties.

upper arm." *Id.* at 179. The encounter was characterized as a "complete physical examination," but there were no corresponding findings, assessment, diagnosis or treatment plan regarding the left arm/shoulder. *Id.* at 175-83. The PCP also "recommend[ed] annual influenza vaccine," without acknowledging that Petitioner had received a flu vaccine the previous month. *Id.* at 181. Ten (10) subsequent medical encounters for other concerns do not document any ongoing arm/ shoulder symptoms. *See generally id.* at 102-170 (in reverse chronological order).

On September 16, 2021, Petitioner established care with a chiropractor[5] due to "recently… having some mid back and lower back pain" potentially related to her recent exercise; weight loss; computer-based job; and use of a standing desk. Ex. 4 at 99. The objective findings were: "C4-5 segmental joint dysfunction. Ltd shoulder ROM. T4-5 segmental joint dysfunction. Posterior sacrum with BL sacroiliac function." *Id.* at 99-100. The chiropractor assessed somatic dysfunction of the cervical, thoracic, and lumbar spine. *Id.* at 100. He recorded the following plan: "Activator[6] scapula BL [bilateral]. Manual chiropractic adjustment of the cervical region. Anterior thoracic spine adjustment. Drop technique sacrum. Traction hips." *Id.* He recorded that Petitioner generally displayed "[g]ood immediate response: much looser, minimal pain." *Id.*

Nearly a month later, on October 12, 2021, Petitioner and the chiropractor followed up for: "General check today. Some left shoulder tightness." Ex. 4 at 95. The objective findings, assessment, plan, and response were identical *except* for the chiropractor focusing the "activator" treatment on the "left side primary" (rather than bilaterally at the previous encounter). *Id.* at 95-96.

*Vaccination and Subsequent Symptoms*

At a November 5, 2021 primary care annual evaluation, Petitioner received the at-issue flu vaccine, in her left deltoid. Ex. 4 at 70-71, 65, 62-61; Ex. 3 at 2; Response at 3. She did not at this time report any concerns related to her left shoulder or arm (and that arm was used for blood pressure reading). Ex. 4 at 71, 73. The physical examination was unremarkable except for a "1.5 cm firm mass in the posterior [left] axilla, mobile, superficial, no erythema or warmth." *Id.* at 74 (also noting "strength and sensation equal and strong bilaterally upper and lower extremities"). The PCP diagnosed the left axilla mass as a sebaceous cyst, which Petitioner could consider "excision vs I&D." *Id.*

---

[5] Petitioner's PAR Questionnaire lists the first date of chiropractic service as September 16, *2022*, ECF No. 7 at 1. But the parties' briefing and an independent review of the medical records did not identify any earlier encounters.

[6] Petitioner states that an Activator is a "spring-loaded handheld device" that is "designed to mimic the effects of a manual adjustment." Brief at 3, n. 1.

Four days later, on November 9, 2021, the chiropractor noted that Petitioner was "[d]oing pretty well. Left shoulder is sore – got very sore after the flu shot on Friday (had a tough time lifting her arm). Prior to the injection, no issues." Ex. 4 at 65. The chiropractor's objective findings, assessment, plan, and response were identical to that from the previous encounter (on October 12, 2021). Ex. 4 at 65-66.[7]

On November 19, 2021, Petitioner sought a primary care evaluation of her "significant" pain, not fully relieved by NSAIDs, since the vaccination in her left arm two weeks earlier. Ex. 4 at 62. The PCP tentatively assessed left biceps tendonitis, prompting prescriptions for meloxicam and voltaren topical gel, and home exercises. *Id.* at 62-63.

On January 28, 2022, the PCP recorded that Petitioner continued to have left shoulder pain, stiffness, and weakness since her vaccination on November 5, 2021. Ex. 4 at 47. Petitioner's pain was relieved with daily meloxicam, but the pain still disrupted her sleep and occurred with small movements. *Id.* An exam found normal range of motion ("ROM") but tenderness and positive Hawkins, Jobes, Yergason, and cross-over tests. *Id.* at 48. The PCP suspected rotator cuff tendinopathy or bursitis; she administered a left subacromial steroid injection one week later (on February 4, 2022) and ordered formal physical therapy ("PT"). *Id.* at 46, 29-30, 24-26.

At a February 10, 2022 PT initial evaluation, Petitioner denied any "prior history of shoulder injury" and she reported an "onset left anterior shoulder pain after" the vaccination. Ex. 4 at 22. The recent steroid injection had "provide[d] some pain relief," but her pain still rated 4/10. *Id.* Exam of the left shoulder found painful and somewhat limited ROM; tenderness; positive Hawkins-Kennedy, Speed's, and painful arc tests for which the therapist instructed Petitioner on home exercises (rather than recommending any further *formal* PT at that time). *Id.* at 22-23.

At a May 16, 2022 primary care follow-up, Petitioner reported that the steroid injection (given 3.5 months earlier) had improved her left shoulder pain and mobility for four weeks, then the symptoms had returned to the prior level. Ex. 4 at 9. Petitioner rated her pain as 4/10 again, also characterizing it as "intermittent." *Id.* She reported continuing her home exercises. *Id.* An x-ray's findings were normal except for "minimal acromioclavicular osteoarthritis." *Id.* at 6. The PCP referred Petitioner to orthopedics for further evaluation. *Id.* at 9.

---

[7] The left shoulder was also mentioned at some subsequent chiropractic appointments. Ex. 4 at 58-59 (Dec. 7, 2021); *id.* at 52-53 (Jan. 20, 2022); *id.* at 14 (Apr. 18, 2022); Ex. 6 at 224 (Feb. 24, 2023); Ex. 7 at 87 (June 9, 2023); *id.* at 83 (June 27, 2023); *id.* at 81 (June 30, 2023).

On June 10, 2022, Petitioner obtained an orthopedics initial evaluation of her post-vaccination left shoulder symptoms, which were suggestive of subacromial impingement and biceps tendinitis. Ex. 11 at 30-31. Therefore, she received a steroid injection to the subacromial and bicipital groove on July 12, 2022. *Id.* at 22-23.

Five months later, at a December 12, 2022 orthopedics follow-up, Petitioner reported that her past steroid injections "did help with symptoms however for only a few months at a time." Ex. 6 at 317. Her "[s]ymptoms gradually came back" again, and primarily involved pain along the anterior to lateral shoulder. *Id.* The telephonic appointment could not feature a physical exam, and the orthopedist planned an MRI for further diagnostic evaluation. Ex. 6 at 316; *see also* Ex. 11 at 31 (orthopedics initial encounter, recognizing the possibility of a rotator cuff tear).

The December 17, 2022 left shoulder MRI impressions were: "1. Full thickness partial-width tearing of the anterior distal supraspinatus tendon… with associated minor intrasubstance delamination extension back [to] the level of the muscle belly. No additional cuff tearing. 2. Mild glenohumeral chondromalacia. 3. Small shoulder effusion." Ex. 6 at 310.

On January 26, 2023, an orthopedic surgeon assessed Petitioner with a left shoulder rotator cuff tear, subacromial impingement, and biceps tenderness. They planned on future surgical intervention. Ex. 6 at 271-72.

On February 27, 2023, Petitioner underwent left shoulder arthroscopic surgery, consisting specifically of subacromial decompression; extensive debridement (including the biceps, anterior interval capsular tissue; anterior and posterior labrum; and subacromial bursa); and rotator cuff repair. Ex. 6 at 101-02. Petitioner was sent home that same day with a limited prescription for oxycodone and a shoulder sling to wear for six weeks. *Id.* at 103.

Petitioner's post-operative recovery included 10 PT sessions between March 13, 2023 – July 25, 2023. Ex. 6 at 36-37, 31-32, 27-29, 21-23, 13-15, 8-10; Ex. 7 at 90. 85, 79, 77 (organized chronologically). Additional orthopedics records reflect a substantial recovery of the left shoulder, but some *right-sided* overcompensation (by August 28, 2023) treated with a steroid injection (on September 19, 2023). Ex. 6 at 40-41, 18; Ex. 7 at 92-93, 73-75, 71-72 (organized chronologically).

### B. Witness Statements[8]

In July 2023, Petitioner denied having "any" left shoulder symptoms or treatment occurring before the November 2021 vaccination. Ex. 2 at ¶ 2.

In a December 2024 supplemental statement, Petitioner acknowledged the pre-vaccination records of shoulder pain (from her PCP and chiropractor), stating: "I am not challenging the truthfulness or accuracy of those records, but… if I ever complained of any shoulder pain it was such a minor and temporary pain that I do not even recall it. At no point prior to my vaccination was I ever experiencing any sort of shoulder pain that caused me to seek medical treatment or made me think I needed medical attention for my shoulder. However, after receiving my [November 2021] vaccination, the pain began quickly and was incredibly intense, and I quickly realized something was seriously wrong. My left shoulder was fine prior to receiving the vaccine and has never been the same ever since." Ex. 10 at ¶ 7.

Petitioner's supplemental statement also describes the left shoulder injury's severity, duration, and impact on her life. For example, she was unable to perform simple tasks such as picking up and holding her granddaughter and unfastening her bra. She also had difficulty sleeping. Ex. 10 at ¶¶ 1-6.

### III.   Factual Findings and Ruling on Entitlement

### A. Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the alleged injury's severity, the vaccine received, and the lack of other award or settlement,[9] a petitioner must establish that he or she either suffered an injury meeting the Table criteria, in which case causation is presumed, or he or she suffered an injury shown to be caused-in-fact by the vaccination received. Section 11(c)(1)(C).

---

[8] These statements are not notarized, but they are declared to be true and correct, under penalty of perjury. *See* 28 U.S.C.A. § 1746 (providing that such a statement may be given like force and effect as an affidavit).

[9] In summary, a potential petitioner must establish that the alleged injury or its residual effects lasted for over six months, resulting in inpatient hospitalization and surgical intervention; or death. Section 11(c)(1)(D). A petitioner must also establish that he or she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; and he or she has not filed a civil suit or collected an award or settlement for the injury. Section 11(c)(1)(A)(B), (E).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

7

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at \*5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

I am resolving the parties' current disputes on the written record. The Vaccine Act and Rules not only contemplate but encourage special masters to decide many matters on the papers where, in the exercise of their discretion, they conclude that doing so will properly and fairly resolve the issue. *See* 42 U.S.C. § 12(d)(2)(D); Vaccine Rule 8(d). Indeed, the decision to rule on the record in lieu of a hearing has been affirmed on appeal. *Kreizenbeck v. Sec'y of Health & Hum. Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020); *Hooker v. Sec'y of Health & Hum. Servs.*, No. 02-472V, 2016 WL 3456435, at \*21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided cases on the papers in lieu of hearing and those decisions were upheld).

## B. No Evidence of Prior History of Shoulder Issues

As required for 42 CF.R. § 100.3(c)(10)(i), Petitioner has preponderantly established that no prior "history of [eft shoulder] pain, inflammation, or dysfunction… would explain" her alleged SIRVA in November 2021.

8

Respondent is correct that a November 3, *2020* primary care record (Ex. 4 at 179-80) – generated a year prior to the relevant vaccination - reflects Petitioner's subjective complaint of left shoulder pain. However, this complaint was "not corroborated by any exam findings, diagnosis, or plan"; potentially attributable to a left-sided vaccination just 19 days earlier (a fact not recognized by the attending PCP, *but see* Ex. 4 at 198-200, 208); and the complaint was never revisited in any *subsequent* primary care records. Brief at 2. This is not strong evidence of a preexisting shoulder injury that potentially explains the alleged SIRVA from the November 2021 vaccination.

More problematic are the September 16 and October 12, 2021 chiropractic records establishing the existence of limited ROM and "tightness," prompting scapular adjustments. Ex. 4 at 99-100, 95-96. These records reflect *some* degree of left shoulder complaints, potentially representing "dysfunction" under the QAI's meaning. But such notations do not obviously constitute evidence of left shoulder "inflammation" or "pain" (the notation of "shoulder tightness" is rather vague, and in contrast to the separate note of "mid back and lower back pain"). Moreover, the chiropractor never assessed Petitioner with any specific shoulder injury - only somatic dysfunction throughout the cervical, thoracic, and lumbar spine. Brief at 9.

It is also relevant that as of the November 2021 date of vaccination, the PCP did *not* find any left shoulder injury, even upon documenting a sebaceous cyst at the left posterior axilla (armpit) which likely would have required lifting the left arm overhead. Brief at 11-12 and Reply at 1-2, citing Ex. 4 at 71, 74.[10] This record is more focused on a potential shoulder injury and more contemporaneous to Petitioner's condition prior to the at-issue vaccination.

Later in time, Petitioner and her medical providers – including the same chiropractor and primary care provider, as well as a new physical therapist and orthopedist – consistently recorded the fact of a new left shoulder injury after the November 5, 2021 vaccination. No connection was made to her earlier complaints – by either the chiropractor (who continued to treat her for back pain until at least 2023) or any other provider, even though all of Petitioner's treatment was in the same Kaiser Permanente managed care consortium (increasing the potential for a more overarching diagnosis). *See e.g.*, Ex. 4 at 65-66, 62-63, 58-59, 46-48, 22-24; Ex. 11 at 30-32, 22-24.

Thus, Respondent correctly notes some evidence of pre-vaccination shoulder complaints – but it is *not evident* that those complaints "would explain" the alleged SIRVA. *Compare e.g., Filipovich v. Sec'y of Health & Hum. Servs.*, No. 19-1406V, 2023 WL

---

[10] The axilla is "a pyramidal region located inferior to the glenohumeral joint and shoulder girdle, at the junction of the upper limb and thoracic wall." The axilla's posterior wall is "formed by the subscapularis, teres major and latissimus dorsi." Teach Me Anatomy, *The Axilla Region*, https://teachmeanatomy.info/upper-limb/areas/axilla/ (last accessed Mar. 12, 2026).

2401692, at *6 (Fed. Cl. Spec. Mstr. Mar. 8, 2023) (Table SIRVA dismissal due to a better-documented, several-year-long history of hypertonicity and strain in the affected shoulder); *Draper v. Sec'y of Health & Hum. Servs.*, No. 22-1517V, 2025 WL 2675968, at *4 (Fed. Cl. Spec. Mstr. Aug. 15, 2025) (order to show cause regarding preexisting chronic shoulder pain, severe osteoarthritis, and glenohumeral joint degenerative changes). The kinds of cases where an alternative, preexisting problem not only exists, but more likely embodies the purported SIRVA, involve far better-documented medical record evidence of the prior issue than can be seen in this matter.

### C. Remaining Table SIRVA QAI Criteria and Statutory Requirements

Petitioner's success in meeting the remaining QAI requirements is not disputed, and I also find that they have been preponderantly satisfied. There is preponderant evidence that the vaccine was administered in her left shoulder. Ex. 4 at 70-71, 65, 62-61; Ex. 3 at 2; Response at 3. She developed new pain within 48 hours post-vaccination, followed by decreased range of motion. Those symptoms were limited to the left shoulder, and they were not explained by another condition or abnormality. *See e.g.*, Ex. 4 at 64-66, 62-63, 22-23.

The statutory requirements applicable to all claims are also preponderantly established. Petitioner received a covered vaccine in the United States. Ex. 4 at 70-71, 65, 62; Ex. 3 at 2; Response at 3. She experienced residual effects of the injury for more than six months. *See, e.g.*, Ex. 4 at 9; Ex. 11 at 30-31. And she states that she has not received any type of award, judgment, or settlement for this alleged injury. Ex. 2 at ¶¶ 4-5. Thus, Petitioner is entitled to Vaccine Program compensation.

### IV.  Appropriate Compensation for Petitioner's Pain and Suffering

#### A. Authority

In another recent decision, I discussed at length the legal standard to be considered in determining SIRVA damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I and II of *Matthews v. Sec'y of Health & Hum. Servs.*, No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr.

Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[11]

### B.    Analysis

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact awareness of the injury. Therefore, I analyze principally the injury's severity and duration.

When performing the analysis in this case, I review the record as a whole, including the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

The medical records reflect[12] that after the November 5, 2021 vaccination, Petitioner experienced new shoulder pain within 48 hours, which she reported promptly – first to her established chiropractor just four days post-vaccination, then to her PCP ten days post-vaccination. The initial suggestions for conservative treatment (oral and topical steroids, and home exercises) were followed by a two-month gap before the next primary care follow-up appointment. Petitioner's subsequent care was consistent and progressive – featuring a formal PT evaluation; two steroid injections, each providing temporary relief; referral to orthopedics specialists and imaging; surgical intervention (at 16 months post-vaccination); and 10 post-operative PT sessions. The last PT session on July 25, 2023 (about 21 months post-vaccination) was the final incident of formal treatment for Petitioner's left shoulder – which noted only "mild" pain after lifting her granddaughter, and independence with a home exercise program. Ex. 7 at 77-78. Petitioner seems to have self-discharged from formal PT, as she did not attend another session that was apparently authorized. Ex. 7 at 78.

---

[11] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[12] I recognize that Petitioner had tightness and an unspecified degree of limited ROM, but not necessarily pain, that was one aspect of chiropractic treatment just *before* the SIRVA's onset. The post-vaccination chiropractic appointment records continue to mention manual adjustment of the shoulder, but a primary focus on cervical, thoracic, and lumbar *spine* adjustment. These complaints are unrelated and not included in the SIRVA compensation – despite Respondent's argument that Petitioner "had pre-existing shoulder complaints and received the same treatment" both before and after vaccination, Response at 18.

The orthopedics follow-up evaluation on August 28, 2023, confirms that Petitioner's left shoulder was "recovering well" without ongoing formal treatment or medications. Ex. 7 at 73-75. However, the damages award will also take into account some degree of post-operative reliance on the *right* shoulder/arm, warranting one steroid injection on September 19, 2023 (22 ½ months post-vaccination). *Id.* at 70-72.[13]

Overall, Petitioner's SIRVA pain was acute, but somewhat manageable with a conservative treatment course of home exercises, over-the-counter pain medications, and two steroid injections. But her eventual recourse to surgery at 16 months post-vaccination, formal PT until 21 months post-vaccination, and a steroid injection to the opposite *right* shoulder evidences moderately severe pain and suffering overall.

As part of his damages briefing, Respondent questions the "true impetus for Petitioner's surgery" based on the assessments of osteoarthritis ("a degenerative bone disease"), impingement syndrome, and rotator cuff tearing (which, Respondent argues, is "not typically cause[d]" by a SIRVA). Response at 14 (internal citations omitted). But Respondent did not raise this argument against *entitlement* for the SIRVA claim (e.g., under 42 C.F.R. § 100.3(c)(iv)). I find it more likely than not that Petitioner's SIRVA involved new pain and inflammation of preexisting pathology in the shoulder, resulting in her surgery within a reasonable timeframe post-vaccination. And it is not practicable under the facts of this case to separate out the "SIRVA" versus "non-SIRVA" aspects of a single surgery.[14]

Turning to the parties' respective positions, Petitioner seeks a past pain and suffering award of $140,000.00. Brief at 14-15. She specifically argues that her case is comparable to what was seen in *Amor* and *Blanco*,[15] but more severe because she sought

---

[13] Respondent states that the final two orthopedics appointments "were for right shoulder complaints," Response at 15, n. 6. But Respondent does not dispute that the right shoulder complaints were a sequela of the left-sided SIRVA and surgical intervention. *Id.* at 6 (quoting from the Aug. 28, 2023 orthopedics record that Petitioner has "now got some compensation issues on the right side…").

[14] A rotator cuff tear does not "*per se* preclude a finding that a Table SIRVA exists." *Lang v. Sec'y of Health & Hum. Servs.*, No. 17-0995V, 2020 WL 7873272, at *13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020) (noting an HHS-CDC joint study which found that rotator cuff tears were present in approximately 40% of a cohort of compensated SIRVA cases); *Grossmann v. Sec'y of Health & Hum. Servs.*, No. 18-0013V, 2022 WL 779666, at *17 (Fed. Cl. Spec. Mstr. Feb. 15, 2022) (citing the Atanasoff article relied upon in creating the SIRVA QAI, for the proposition that "MRI findings… such as rotator cuff tears, may have been present prior to vaccination and became symptomatic as a result of vaccination-associated synovial inflammation"); *accord* 42 C.F.R. § 100.3(c) (describing SIRVA as "an inflammatory reaction" within the musculoskeletal system of the shoulder).

[15] *Amor v. Sec'y of Health & Hum. Servs.*, No. 20-978V, 2024 WL 1071877 (Fed. Cl. Spec. Mstr. Feb. 8, 2024) (awarding $130,000.00 for past pain and suffering); *Blanco v. Sec'y of Health & Hum. Servs.*, No. 18-1361V, 2020 WL 4523473 (Fed. Cl. Spec. Mstr. Jul. 6, 2020) ($135,000.00).

medical evaluation of her shoulder sooner (four days post-vaccination, compared to 11 days in *Blanco* and 23 days in *Amor*) and she suffered a post-surgical overuse injury requiring a steroid injection to the opposite right shoulder/arm. Brief at 14-15. But Respondent persuasively notes that just two steroid injections were given for Petitioner's left-sided SIRVA, compared to five steroid injections in *Amor* and four steroid injections in *Blanco* – which is consistent with the better documentation of pain ratings above 5/10 in those cases. Response at 15-16. Otherwise, each case (*Alvarez*, *Amor*, and *Blanco*) featured fairly prompt starts to medical treatment; multiple steroid injections; some prescription medications (either steroids or NSAIDs); less than 25 PT sessions; arthroscopic surgery;[16] and a SIRVA substantially resolving in about two years. I find that an appropriate pain and suffering award in the present case *Alvarez* should be similar, but slightly lower – specifically $125,000.00.

Respondent has not adequately supported his recommendation of a "maximum of $85,000.00" in this case. Response at 18. First, Respondent's argument for a "downward adjustment" from the award in *Hunt*[17] may depend on an inadvertent misreading of that opinion: specifically, Respondent states that the *Hunt* petitioner's SIRVA warranted a higher award because it required a greater number of steroid injections – either four or five. Response at 17-18. But I counted just *three steroid injections* (on November 27, 2018 and February 5, 2019 prior to surgery; and after surgery on September 9, 2019). *Hunt*, 2022 WL 2826662, at *8-9.[18] This is directly comparable to *Ms. Alvarez's three steroid injections*. And while the *Hunt* petitioner once reported "8+/10" pain and underwent 11 PT sessions *before* surgery, her steroid injections provided "significant" relief and reported periods of little to no pain, supporting a "mild" injury overall. *Id.* at *9-10; *see also* Reply at 4. Ms. Alvarez's SIRVA appears to have been more consistent, but manageable – and endured for 16 months (compared to just under 8 months in Hunt).

Respondent's other cited case, *Martin,*[19] featured a greater number of PT sessions (16, compared to 11 in the present case). Response at 18, citing *Martin*, 2021 WL 2350004, at *3. However, *Martin* also included many indicators of a *less severe* injury including a slightly slower presentation for treatment (11 days post-vaccination); notations

---

[16] Notably, the *Alvarez* and *Blanco* petitioners' arthroscopic surgeries seem to have been similar – with each featuring subacromial decompression, debridement, and rotator cuff repair. *Compare* Ex. 6 at 101-02; *Blanco*, 2020 WL 4523473, at *3.

[17] *Hunt v. Sec'y of Health & Hum. Servs.*, No. 19-103V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (awarding $95,000.00 for past pain and suffering).

[18] I gave less weight to the *Hunt* petitioner's return to treatment and *another* steroid injection over a year later, in March 2021. *Hunt*, 2022 WL 2826662, at *9.

[19] *Martin v. Sec'y of Health & Hum. Servs.*, No. 19-830V, 2021 WL 2350004 (Fed. Cl. Spec. Mstr. May 5, 2021) ($100,000.00).

of more "mild" pain; a longer unexplained treatment gap (of 18 weeks); the apparent absence of any prescription medications or PT evaluation before surgery; surgical intervention at just 7 months post-vaccination; only one steroid injection (after surgery); and a substantial recovery by about 12 months post-vaccination. *Martin*, 2021 WL 2350004, at *3-4. By each of these measures, the present Petitioner's SIRVA was *more* severe, and she therefore appropriately should receive a higher award.

## Conclusion

For the foregoing reasons, **I conclude that Petitioner is entitled to compensation for a Table SIRVA.**

**I also award Petitioner a lump sum payment of <u>$127,391.55</u> (representing $125,000.00 for past pain and suffering,[20] plus $2,391.55 for past unreimbursable expenses[21]) to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[22]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
**Brian H. Corcoran**
**Chief Special Master**

---

[20] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[21] The parties stipulated to the past medical expenses. Joint Status Report, ECF No. 30 at 1 and n. 1.

[22] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.